[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The plaintiffs, RR Pool Home, Inc. ("RR"), and Neil Farans, Alvin G. Farans and Diane Green ("partnership"), appeal, pursuant to General Statutes, Sec. 8-8, from a decision of the defendant, the Zoning Board of Appeals of Ridgefield ("Board"), that affirmed the denial of the partnership's site plan application by the planning director of the Town of Ridgefield, the intervening defendant, Oswald Inglese (the planning director).
The plaintiffs commenced this appeal by service of process on February 18, 1994 and, thereafter, they filed an amended complaint on July 29, 1994 against the Board. The plaintiffs allege that the Board's action in affirming the planning director's decision to deny site plan approval was arbitrary, illegal and an abuse of discretion; violates their constitutional rights to procedural and substantive due process; "demonstrated bias, hostility, prejudice, predisposition and discrimination toward the, plaintiff, all of which denied due process and Equal Protection of the Laws, and tainted the decision appealed from"; and that Sec. 324.0 of the Ridgefield Zoning Regulations "is void for vagueness and overbroad on its face and was applied in an illegal and discriminatory manner." (Plaintiffs' Amended Complaint, par. 22(g).)
The partnership owned the property that is the subject of this appeal located at 975 Ethan Allen Highway in the Town of Ridgefield ("the property"), from the time of the Board's written decision in this matter on February 14, 1994 (Return of Record ("ROR"), p. 6: ZBA Decision 93-063), until September 2, 1994, when RR purchased the property for $315,000 from the partnership. (Plaintiffs' Exhibit 6: April 15, 1994 purchase and CT Page 5119 sale agreement; Plaintiffs' Exhibit 8; September 2, 1994 warranty deed.) As of September 2, 1994, and at the time of the hearing on this matter, the partnership's interest in the property was reduced to a $1,500 purchase money mortgage on the property. (Plaintiffs' Exhibit 9: September 2, 1995 purchase money mortgage deed.)
RR maintained a lease on the property from September 1, 1993 until May 31, 1994. (Plaintiffs' Exhibit 5.) The lease was never renewed. On April 15, 1994, however, RR and the partnership entered into an "agreement" whereby RR would purchase the property from the partnership for $315,000, the closing to take place on or before 10:00 a.m. on September 1, 1994, with time being of the essence. (Plaintiffs' Exhibit 6.) The closing actually occurred on September 2, 1994. (Plaintiffs' Exhibit 8.)
The action that the plaintiffs are challenging is the decision by the Board to affirm the planning director's denial of site plan approval to RR "to operate a retail business from property situated in the B-2 zone and located at 975 Ethan Allen Highway." (ROR, p. 6, Decision.)
In July of 1990, the prior tenant of the property, Richard Amatulli, doing business as Classics of Ridgefield, received approval of his site plan to operate a wholesale oriental rug, fine furniture and art business. (ROR, p. 6, Decision; ROR, Exhibit Y, p. 509: July 23, 1990 site plan approval.)[1] The application for the site plan approval indicated that Amatulli "proposes to use the premises as sales and administrative offices, warehousing and showroom area for Oriental rugs, fine furniture, and art. He expects his firm . . . will primarily sell and provide services to `trade clients,' that is to say, its clientele will generally be designers, decorators, architects, dealers, etc." (ROR, Exhibit Y, p. 513: July 6, 1990 letter re: proposed use of 975 Ethan Allen Highway.) The proposal went on to state that "[h]e anticipates that the typical daily traffic flow generated by this business will not be great. . . . He expects that the volume of daily business with the general public will be incidental, and not his primary source of revenue." (ROR, Exhibit Y, p. 513.)
Thereafter, in October, 1990, "Richard Amatulli applied for a variance to allow some retail sale of oriental rugs, in conjunction with his wholesale business." (ROR, p. 7, Decision.) His petition for a variance was limited to "retail sales only on CT Page 5120 weekends, holidays, and . . . approximately four times a year, or even limited to four times a year, seasonal sales. At the and of the season they move out prior seasons merchandise by a short term sale. And that would be it. The rest of the time there won't be retail type business." (ROR, Exhibit CC, p. 606: Transcript of November 5, 1990 ZBA Appeal 90-099 [hereinafter "Amatulli variance"].) "We are not asking for carte blanche approval to go ahead and sell retail seven days a week to whoever comes in the door whenever they come in the door. We are asking you to limit the times that we may be able to sell retail." (ROR, Exhibit CC, p. 606.)
At the hearing on the application for a variance, Amatulli presented evidence that his use of the property would be limited to products that generate:
 [A] relatively low traffic flow, since as you will appreciate, the inventory is a higher — priced luxury type item. We are not dealing with the rapid turnover, the flow of people coming in and buying a $5. item. We are talking about a relatively small amount of people coming in, seeing what the product is, doing their shopping there and perhaps elsewhere, coming back usually and buying a very expensive product. So a few sales a month, depending on the product, may be enough business generated to carry overhead, depending on what is sold, of course. But that is the nature of the customer, the nature of the item being sold. So in this respect, as you will appreciate and recall it is similar in almost every respect to an art gallery or an antiques store, as it deals of one of a kind pieces rather than something that is mass produced. . . . It is essentially a wholesale business, and retail sales are secondary and ancillary to the wholesale nature of the business.
(Emphasis added.) (ROR, Exhibit CC, pp. 605-06.) When asked what price range the rugs Amatulli sold would be in, his attorney stated: "[h]is smaller ones are still quite high ticket. I mean, 3 by 5 or 4 by 6 rug would cost several hundred dollars or into four figures. So we are not dealing with a remnants type of situation." (ROR, Exhibit CC, p. 607.) Later on in the proceeding, Amatulli spoke of carpets he sells costing in excess of $30,000. (ROR, Exhibit CC, p. 608.) CT Page 5121
On November 7, 1990, the Board granted Amatulli a variance "to allow the use of the property for retail and wholesale sales, for property situated in a B-2 zone and located at 975 Ethan Allen Highway, at the intersection of Route 35 (Danbury Road)." (ROR, Exhibit A, p. 380: Appeal No. 90-099, November 7, 1990 Amatulli variance.) In a portion of the memorandum entitled "SCOPE OF THE ACTION," the Board held that "[t]his action permits wholesale and retail sales to be conducted from the premises, unrestricted as to type of customer or hours of operation, but restricted as to the products to be sold. Such wholesale and retail sales shall be limited to oriental rugs, fine furniture and art." (ROR, Exhibit A, p, 380.) The Board approved the variance for the following reasons:
 1. The zoning regulations are vague in that they do not define the terms wholesale or retail. This presents an unusual hardship on this property since it is used for the wholesale sale of oriental rugs, fine furniture and art as limited by the site plan approval. This makes it necessary for purchasers of these items to employ a contractor to make the purchase.
 2. The property is surrounded by properties used for retail purposes.
 3. The shape of the property which is located at the intersection of two main roads, Routes 7 and 35, limits activity on the lot. This limited activity, combined with the limited products that will be sold, is in keeping with the general scheme of development in the area and is not contrary to the public health, safety and welfare.
(ROR, Exhibit A, p. 380.) Subsequent to the granting of the Amatulli variance, Classics of Ridgefield went out of business.
On March 9, 1993, the partnership, as owners of the building, filed an application for a variance to allow for full retail use of the property, including outdoor storage, in an effort to make the property more marketable.[2] (ROR, Exhibit DD, p. 629: March 9, 1993 application for variance; ROR, Exhibit DD, p. 635: Minutes of variance application meeting.) During the hearing on the request for a variance, it was revealed that RR would be the new tenant in the building and that it planned to purvey CT Page 5122 "furniture, lawn furniture, [and] outside furniture." (ROR, Exhibit EE, p. 652: June 7, 1993 Transcript of hearing on variance application.) Recognizing the operative language in the Amatulli variance, the partnership's attorney indicated that "I don't know if their [RR] furniture qualifies as fine furniture . . . . It is expensive, but I doubt that is what you meant when you said fine furniture." (ROR, Exhibit EE, p. 652.) Further, when asked at the variance hearing whether the traffic into RR would be greater than that experienced by Amatulli, RR's attorney indicated that "we would have more than he." (ROR, Exhibit EE, p. 665.)
On June 25, 1993, the Board rendered a decision denying the partnership's application for the variance. (ROR, Exhibit DD, p. 633: June 25, 1993 decision on Appeal No. 93-014.) In denying the petition, the Board found that the partnership had shown no unusual hardship, there was no confiscation due to the fact that the property could be put to other uses, the available parking spaces did not comply with the minimum contained in the regulations and "[t]he property is unsuitable for unrestricted retail use. The property is located at a hazardous intersection and has limited access. The limited parking available on-site, combined with the hazardous traffic patterns, make the proposed use a safety issue. The proposal is not in harmony with the general scheme of development in the area and is contrary to the public health, safety and welfare." (ROR, Exhibit DD, p. 633.) The partnership did not appeal from the denial of the variance application. (ROR, Decision, p. 7.)
On July 6, 1993, the partnership filed with the planning director an application for site plan approval. (ROR, Exhibit Z, p. 582: July 2, 1993 Application for site plan approval; ROR, Exhibit A, p. 376: July 2, 1993 letter from Melvin J. Silverman to Inglese.) Although RR is mentioned on the site plan application as the proposed business that would occupy the premises, they were only prospective lessee's at the time. (ROR, Exhibit Z, p. 582.) Further, the application for site plan approval listed the applicant as "Attorney Melvin J. Silverman." (ROR, Exhibit Z, p. 582.) As a letter submitted to the planning director indicates, Attorney Silverman represented the partnership only, not RR. (ROR, Exhibit Z, p. 584, letter received by Board on July 6, 1993, from the partnership apprising the Board that the partnership is represented by Silverman.) As Attorney Silverman stated in his letter filed in support of the application, "I represent the owners of the premises in question CT Page 5123 [the partnership] who wish to lease the premises to a seller of fine furniture, albeit of the type which is used generally out of doors." (ROR, Exhibit Z, p. 580.)
The site plan approval was not solicited by the planning director or the Board, rather, approval was sought on the advice of RR's counsel. (ROR, Exhibit Z, p. 533, par. 8: October 12, 1993 document titled "Appeal" prepared on behalf of RR and the partnership.) "[B]ecause of prior adverse dealings with the zoning authorities of the Town of Ridgefield, RR's counsel requested owners' counsel to obtain a site plan approval." (ROR, Exhibit Z, p. 533, par. 8.) The description of proposed use or uses provided by the partnership in the site plan application was "[w]arehouse, office and retail sale of fine outdoor furniture — see letter of Atty. Silverman dated July 2, 1993, attached." (ROR, Exhibit Z, p. 582: July 2, 1993, Application for Site plan approval.) The current use of the property was described as "[r]etail sale of furniture rugs and art." (ROR, Exhibit Z, p. 582.)
On July 13, 1993, the planning director requested from the partnership's attorney additional materials to assist in his evaluation of the application. (ROR, Exhibit Z, p. 579: July 13, 1993 letter from Oswald Inglese to Attorney Silverman.) Specifically, the planning director asked:
 1. Is the area of the building to be devoted to retail sales the same as the previous tenant? If no, please submit a floor plan showing the different sales areas.
 2. Is there going to be any outside display/storage of items for sale? If yes, please submit a site plan showing the area to be designated as such.
(ROR, Exhibit Z, p. 579.) The planning director also requested photos of the area and a location plan. (ROR, Exhibit Z, p. 579.) On July 27, 1993, the planning director again requested this information because Attorney Silverman had not responded. (ROR, Exhibit Z, p. 576, July 27, 1993 letter from Oswald Inglese to Attorney Silverman.) On August 4, 1993, as a result of Silverman's failure to comply with the two requests for information, the planning director denied the partnership's application. (ROR, Exhibit Z, p. 574: August 4, 1993 letter from Oswald Inglese to Attorney Silverman.) CT Page 5124
On August 6, 1993, Attorney Silverman finally responded to the planning director. (ROR, Exhibit Z, p. 568, August 6, 1993 letter from Melvin Silverman to Oswald Inglese.) He wrote that "[t]he answer to your first question is yes. The answer to your second question is not as clear." (ROR, Exhibit Z, p. 568.) "We are asking for a site plan approval, as I thought I had indicated in my July 2 letter for exactly the same uses approved by you in your July 23, 1990 approval mentioned in my letter. If that approval did not include outdoor display and storage, then this approval will not. If that approval included such outside display/storage, then this one will. In other words, I am asking you for the exact same approval which you granted on July 23, 1990, for these premises, our only difference being that the `fine furniture' permitted by variance will be that used out-of-doors." (ROR, Exhibit Z, p. 568.) "Should the user desire to use the premises' outside areas for display of items for sale and your zoning regulations require that such outside display be shown on an application for site plan approval, then the user will have to comply with the law." (ROR, Exhibit Z, p. 568.)
On September 1, 1993, the planning director rescinded his denial of the site plan application and took Attorney Silverman's tardy filings under consideration. (ROR, Exhibit Z, p. 562: September 1, 1993 letter from Oswald Inglese to Melvin Silverman.) In conjunction with the application, Silverman filed the site plan drawings used by the Board in granting the Amatulli variance; (ROR, Exhibit Z, p. 587, 588 591: Variance Appeal 90-099 site plan drawings); and photographs of some of the items that RR sold. (ROR, Exhibit Z, p. 589 590: photos of chairs and rugs.) In considering the site plan application, concerns arose as to whether outdoor furniture and fine furniture were any different vis-a-vis the zoning regulations and the Amatulli variance. (ROR, Exhibit Z, p. 563: August 23, 1993 letter from Richard Baldelli, Zoning Enforcement Officer, to Thomas Beecher, Esq.; ROR, Exhibit Z, p. 560: September 13, 1993 letter from Richard Baldelli to Francis Collins, Esq.)
On September 24, 1993, the planning director denied the application for site plan approval. (ROR, Exhibit Z, p. 556: September 24, 1993 letter from Oswald Inglese to Melvin Silverman, Esq.) "Be advised said application is hereby denied. Denial is based on but not necessarily limited to:
1. The business you are planning to operate, CT Page 5125 with the merchandise you are proposing to sell, is not the `fine furniture' contemplated by the Zoning Board of Appeals in its decision on November 5, 1990 in appeal No. 90-099;
 2. the business you are proposing to operate, with the merchandise you are proposing to sell, was specifically denied a variance to do so by the Zoning Board of Appeals at its June 21, 1993 meeting on appeal No. 93-014 [the partnership's denied variance application] (copies enclosed); and,
 3. retail sales is not a permitted use in a B-2 zone.
(ROR, Exhibit Z, p. 556.)
On October 7, 1993, the notice of denial was published in the local paper. (ROR, Exhibit Z, p. 551: October 7, 1993 clipping from The Ridgefield Press; ROR, Exhibit Z, p. 554: Legal Notice filed October 1, 1993.)
On October 7, 1993, pursuant to Ridgefield Code, Sec. 324.0G,[3] the partnership and RR filed an appeal with the Board contesting the actions of the planning director in denying their request for site plan approval. (ROR, Exhibit I, p. 13: October 10, 1993 Appeal from the decision of the official charged with the enforcement of the zoning ordinance.) On November 4 and 11, 1993, a notice was published in The Acorn Press indicating that a public hearing on RR's and the partnership's appeal would be held on November 15, 1993. Written notice of the hearing was also sent to Attorney Silverman and Attorney Ross, representing RR, and the planning director. (ROR, Exhibit II, p. 21-23: November 2, 1993 letters of notice to Silverman, Ross Inglese.)
On November 15, 1993, a public hearing was held on the RR's and the partnership's appeal from the planning director's decision. (ROR, Exhibit X, pp. 92-183: Transcript of November 15, 1993 hearing.) At said hearing, heated discussion and various charges were exchanged between the parties, members of the Board and their respective counsels until the Board, over the objection of counsel for RR, continued the hearing to a later date.
On November 23 and December 2, 1993, notice of the continued hearing was published in The Ridgefield Press. (ROR, Exhibit III, CT Page 5126 p. 24: December 3, 1993 Certificate of publication.) Notice of the hearing was also mailed to RR and the partnership. (ROR, Exhibit III, p. 25, November 22, 1993 letter from Charles Creamer to Melvin Silverman, Esq.) On December 6, 1993, the public hearing reconvened. (ROR, Exhibit X, p. 184-257: Transcript of December 6, 1993 public hearing.)
During the course of the December 6, 1993 hearing, RR and the partnership presented expert testimony as to the type of furniture that RR would sell at the facility. Eileen Corbin, an interior designer testified that RR sold "fine furniture. I don't really have a definition for fine furniture other than to say that it is high quality." (ROR, Exhibit X, p. 96.) She indicated that RR sold wood and rattan furniture for inside as well as outside use. (ROR, Exhibit X, p. 187.)
Berman, a manufacturer's representative for several patio furniture companies, testified that he sold Brown Jordan brand fine indoor and outdoor furniture to RR. (ROR, Exhibit X, p. 188.) He also testified that RR sells furniture made by manufacturers that have had some of their pieces placed in the Smithsonian museum. (ROR, Exhibit X, p. 195.)
Robert Oresman, another manufacturer's representative testified that he sold RR indoor and outdoor wrought iron, wood and aluminum furniture. (ROR, Exhibit X, p. 199.) He also testified that he "spent a lot of time back with my manufacturers trying to figure out if there is any such definition as fine furniture. We could not find anything, no specific meaning to that term. As far as I know and I am concerned, and everyone I have spoken to, we can't figure out that that is more than ambiguous, a very subjective term referring to high quality or high end furniture, which is certainly something that RR sells. These furniture categories that I represent, as well as the tremendous all wicker business that RR has, are all considered very fine furniture for both indoor and outdoor use." (ROR, Exhibit X, p. 199.) One of Oresman's pieces was also displayed in the Smithsonian. (ROR, Exhibit X, pp. 203-04.)
Katz testified that he had "been in the retail business now over 40 years as a salesman. I am familiar with what the RR Pool Company does carry, and they carry a quality line. If you want to refer quality to fine, it is a well made line, a line that could be used indoors as well as outdoors, and my terminology being that it is a line of furniture that you will find in the better CT Page 5127 homes and is sold only in the better type shops." (ROR, Exhibit X, p. 207.) "Mr. Silverman: You consider it to be fine furniture? Mr. Katz: That's correct, absolutely." (ROR, Exhibit X, p. 207.)
David Ross, the president of RR Pools also testified. He stated that "[w]e sell both indoor and outdoor furniture for inside the homes and used in dens, family rooms, porches, kitchens and sunrooms. Our products include tables, chairs, mirrors and sofas. We also sell objects of art such as paintings and statuaries. We sell oriental rugs and sell, and will sell oriental rugs in Ridgefield. All of the furniture which we sell in Ridgefield will be upscale and high quality. Our manufacturers include high quality, expensive lines such as Brown Jordan, Lane Venture, Tri-Comfort. Our prices include chairs from Brown Jordan as high as $750. . . . The furniture is commonly used inside as well as outside the home. It is our request to do exactly the same for the property as the original map and site plan previously approved by Classics of Ridgefield. There will be no changes in the previously approved, the way in which we use it as compared to Classics of Ridgefield. We will continue the same division of the building as storage, office, retail, as previously done on the map. . . ." (ROR, Exhibit X, p. 226-27.)
 Mrs. Morelli: Right now, going by the RR Pool Store on Danbury Road, it looks as though you have converted to selling fine Christmas ornaments, rather than fine furniture. Do you intend to do that? Convert to another type of merchandise?
 Mr. Ross: The operation of the Ridgefield store, that is a different operation. That's our RR Pool and Home as it exists now. At this location we intend to sell fine furniture, art and oriental rugs.
 Mrs. Morelli: Oh, so you are changing the nature of the business?
 Mr. Ross: We are just going to sell fine furniture, oriental rugs and art.
 Mrs. Morelli: Are you changing the nature of the business from what your present CT Page 5128 Ridgefield store carries?
Mr. Ross: Yes.
. . . .
 Mr. Creamer: You are talking about something entirely different. He is not going to operate — from what I understand — you are not going to operate the kind of operation you have in Ridgefield now. This is going to be a totally different type of operation.
Mr. Silverman: That's correct.
Mr. Ross: It won't be totally different.
 Mr. Creamer: And what you asked Mr. Inglese for was an entirely different type of operation than you are currently conducting. Is that correct?
 Mr. Ross: It was a different operation. It is not a 100% totally, but all we were requesting to sell there was fine furniture, oriental rugs and art.
Mr. Mannion: What do you sell now?
 Mr. Ross: Fine furniture, oriental rugs and art, among other products.
 Mr. Creamer: Christmas trees, Christmas ornaments. What else do you have out there?
Mrs. Morelli: Spas, outbuildings, hammocks.
Mr. Ross: We do sell those products, yes.
 Mrs. Morelli: Are they all on display on your property?
Mr. Ross: Yes, they are. CT Page 5129
 Mr. Mannion: Are you going to delete any of those items?
Mr. Ross: We will do whatever is allowed by law.
 Mr. Creamer: These are going to be hand-made oriental rugs from the Orient, too. Is that correct?
 Mr. Silverman: These are rugs that he is getting on consignment from Mr. Amatulli.
 Mr. Mannion: He just said he wasn't going to do any more consignment.
Mr. Silverman: No, no.
Mr. Ross: No used oriental rugs.
Mr. Silverman: No used merchandise.
 Mr. Ross: No used merchandise. But this is brand new stuff from Amatulli. In fact, one of the pictures exhibited. . . .
 Mr. Creamer: You know, Mr. Silverman, there may be a gross misunderstanding between the Town Planning Director and your client, because. . . .
 Mr. Silverman: Well, the Planning Director is at liberty to change his mind at any time he wants to.
 Mr. Creamer: Well, I think you ought to approach him with this proposition now, that here this thing is not going to be anything like was presented.
Mr. Ross: It is.
 Mr. Creamer: It is going to be fine furniture, oriental rugs and art, in the building. I mean, everything's great. CT Page 5130
Mr. Ross: No.
Mr. Silverman: And wherever else is allowed by law.
Mr. Ross: Wherever else it is allowed by law.
Mr. Mannion: By what law?
 Mr. Silverman: By the law governing nonconforming uses.
 Mr. Mannion: What statute? What are we talking about?
Mr. Silverman: What statute?
Mrs. Morelli: Yes, what are we talking about?
Mr. Mannion: Be specific. Law? Any law?
 Mr. Silverman: 8-, what is it. Eight dash three, or two of the General Statutes.
 Mr. Mannion: How about something Moses wrote. Come on.
 Mr. Silverman: The General Statutes say that you cannot prohibit the continuation of a nonconforming use.
 Mr. Mannion: And you are saying that because Amatulli may — he has given you an affidavit saying he put stuff outside, even though he didn't apply for it, that makes it legal?
. . . .
 Mr. Creamer: If he puts it outside, he is going to be just as in violation as Mr. Ross is. He is not going to meet the parking requirements for the building.
Mr. Silverman: There are other areas outside to put CT Page 5131 it besides the parking.
 Mr. Mannion: But you show it on [the map filed in connection with the site plan in] the parking places.
(ROR, Exhibit X, pp. 231-54.)
Thereafter, the December 6, 1993 hearing was continued until December 13, 1993 in order to allow RR and the partnership to complete their presentation. (ROR, Exhibit X, pp. 256-57.)
In connection with the December 13, 1993 hearing, the Board sent a letter to the town clerk notifying her of the meeting and faxed a letter to Attorney Silverman, with no copy to RR. (ROR, Exhibit IV, p. 26: December 7, 1993 Notice of Special Meeting Zoning Board of Appeals sent to Ridgefield Town Clerk; ROR, Exhibit IV, p. 27: December 10, 1993 fax to Melvin Silverman re: continued hearing.) During the continued hearing, Attorney Silverman interrogated the planning director with regard to the reasons for his denial of the site plan application.
With respect to the first reason for the denial, the finding that the products that RR planned to sell were not the "fine furniture" mandated by the Amatulli variance, the planning director indicated that his basis for the denial was that he relied "exclusively on the nature of the language of the Zoning Board of Appeals [variance] and the absence of such language in your application." (ROR, Exhibit X, p. 282.) During the hearing the planning director recited the entire site plan application letter of July 2, 1993, written by Attorney Silverman. (ROR, Exhibit X, pp. 284-85.) Morelli commented, "I don't hear oriental rugs or art in that letter." (ROR, Exhibit X, p. 285.) The planning director responded "[t]here are no such words in here. Also, you will notice that those words do not appear in the site plan application form per se, which is also part of the file." (ROR, Exhibit X, p. 285.)
Further, Attorney Silverman indicated that when he responded to the planning director's request for additional information, he submitted a site plan drawing that indicated outdoor storage in areas that had initially been delineated by Amatulli as parking spaces, which were required under the zoning regulations. (ROR, Exhibit X, pp. 298-99.) The Amatulli variance neither reduced the number of mandatory parking spaces nor permitted the use of CT Page 5132 outdoor display. (ROR, Exhibit X, pp. 312-13.)
The attorney representing the planning director then proceeded to admit into the record the minutes from the hearing on the Amatulli variance indicating the narrow scope of the items that Amatulli planned to sell. (ROR, Exhibit X, pp. 333-36.) He argued that this same body had already denied a variance for full retail use of the property to the partnership, because "`[t]o put something like that at this intersection would be a disaster.'" (ROR, Exhibit X, p. 341.) Attorney Beecher then stated that "there was some gamesmanship being played, and I think we have actually seen a few before this board. Well, we want what you gave Mr. Amatulli; we are not sure what it is, but why don't you go find out what it is and tell us what we can do. We want exactly what you did before, and we want to do whatever is legal. We are not going to tell you what that is, but whatever we are going to do, it is going to be legal if it is okay." (ROR, Exhibit X, p. 353.) Thereafter, the parties presented their concluding remarks and the hearing was adjourned.
On January 27, 1994 and February 3, 1994, notice of the February 7, 1994 decision session of the Board was published inThe Ridgefield Press. (ROR, Exhibit V, p. 28: February 4, 1994 certificate of publication.) During its decision session the Board voted to sustain the decision of the planning director. (ROR, Exhibit XI, pp. 365-75: Transcript of February 7, 1994 decision session.) On February 10, 1994, the notice of the Board's decision was published in The Ridgefield Press. (ROR, Exhibit V, p. 29, February 11, 1994 Certificate of Publication.)
On February 14, 1994, the Board rendered its written decision. (ROR, p. 6-11, Decision.) The Board articulated six reasons for its affirmance of the planning director's decision. The first basis for the Board's ruling was that the "Planning Director made no error in his decision to deny Site Plan Approval in this case. It was clear that the applicants failed to adequately show the Planning Director what was intended for the property and, therefore, no proper decision could be made on the application. It was particularly noted that the applicants would not even tell the Board what was fully intended for the property, and no way existed to determine if the proposal would be in harmony with the zoning regulations, such as parking, lot coverage, etc. In this case, even the attorney for the applicants stated that he had advised his clients that part of the proposed use was not permitted, `that permanent outdoor display is a CT Page 5133 violation of your zoning regulations.' The burden of proof is on the applicants when applying for Site Plan Approval, and not on the Planning Director. The applicants' burden was not fulfilled in this case." (ROR, Decision, pp. 7-8.)
Second, the Board concurred in the planning director's determination that the site plan approval granted to Amatulli and that which the partnership was seeking were different because Amatulli only requested wholesale distribution approval. In the partnership's case, they were attempting to obtain site plan approval for a partial retail use. (ROR, Decision, p. 8.) Therefore, the Board felt that "the site plan approval being requested was clearly substantially different, and the proposed retail use did not meet the requirements of the zone." (ROR, Decision, p. 8.) The third basis for upholding the planning director was that the proposed items that RR would sell from the property did not conform to those contained in the variance granted to Amatulli in 1990, specifically oriental rugs, fine furniture and art. The "variance was granted to allow the purchase of the specific merchandise being offered without the necessity of an intermediary such as an interior decorator." (ROR, Decision, p. 8.) "The location of the property creates a hazard, as the one entrance to the property is just south of a major intersection, and it was the opinion of the board that any use that was granted by variance should be a use that would not generate much traffic. The sale of oriental rugs and fine furniture, in the opinion of the ZBA, would not generate much vehicular traffic and would not, therefore, adversely affect the safety of the neighborhood." (ROR, Decision, pp. 8-9.)
Further, the Board went on to say that "[t]he appellant in the matter now before the board seeks to have the meaning of the term `fine furniture' used to include mass-produced, outdoor furniture, arguing that it is in fact `fine furniture.' This is not the kind of product that was presented to the board when the variance was requested, and it is not the kind of product that was considered by the board when the variance was granted." (ROR, Decision, p. 9.) "The kinds of product that were considered were ones that, like oriental rugs, are not stock items, are made by hand, and if they do not deteriorate physically, are expected to appreciate in value with the passage of time. Outdoor furniture simply does not fit this definition. This is not to suggest that the variance seeks to limit the tastes of the people of Ridgefield or seeks to limit the sale of items sought to be sold by the appellant. Only the sale of certain items at retail is CT Page 5134 allowed at these premises to preserve the zoning regulations, avoid a hardship as those regulations are applied, and preserve the safety and welfare of the community." (ROR, Decision, pp. 9-10.)
The Board's fourth basis for its decision was the fact that even though Amatulli may have engaged in the outdoor display of items, this activity did not, ipso facto, transform the display into a valid nonconforming use. (ROR, Decision, p. 10.) Therefore, the planning director was acting appropriately when he denied the site plan based on the map filed by the partnership detailing an eradication of parking spaces in favor of an outdoor display. (ROR, Decision, p. 10.)
As its fifth basis for decision, the Board noted that the partnership was evasive in their submissions to the planning director. "It was noted that a large volume of exhibits [were] provided to the ZBA that [were] not made available to the Planning Director. Claim by applicant's attorney that `no one asked us' was not considered appropriate." (ROR, Decision, p. 11.)
The Board's sixth and final ground for sustaining the planning director's decision was that the partnership submitted "a map showing that the parking on the property, which already was insufficient for retail use, would be further reduced by outdoor displays. This map was part of the additional information requested by the Planning Director in order to reach his decision, and his consideration of it was appropriate." (ROR, Decision, p. 11.)
As previously indicated, RR and the partnership commenced an appeal from the Board's affirmation of the planning director's denial of the partnership's application for site plan approval.
On July 8, 1994, RR filed a brief in support of its contention that the Board erroneously affirmed the decision of the planning director. They argue that the planning director exceeded his authority by interpreting the Amatulli variance in the fashion that he did. (RR Pretrial Brief, p. 16.) Their second argument is that the actual effect of the vote in the Amatulli variance "was to make retail and wholesale sales a permitted use as of right. The separate `scope of the action' was unauthorized and gratuitous dictum." (RR Pretrial Brief, p. 21.) The third argument of RR is that fine furniture is not a defined CT Page 5135 term; therefore, their due process rights have been violated. (RR Pretrial Brief, p. 28.) The fourth argument of RR is that Ridgefield Code, Sec. 324.0 "Site Plan Approval," is "void for vagueness, lack of standards and overbreadth on its face." (RR Pretrial Brief, p. 35.) The fifth ground that RR offers for sustaining their appeal is that "the plaintiffs were denied due process and equal protection by the prejudgment, predisposition, bias and prejudice of the planning director and the ZBA." (RR Pretrial Brief, p. 38.) The sixth argument is that "the plaintiffs have been subjected to intentional discrimination, ad hoc, arbitrary and selective interpretations and decisions in the administration of the zoning laws, thereby depriving them of equal protection of the laws and due process." (RR Pretrial Brief, p. 41.)
On December 30, 1994, RR filed an additional brief. It maintains that site plan approval was not required in the first instance; therefore, its appeal should be sustained. (Plaintiffs' Trial Brief, p. 6.) In addition it argues that any attempt by the Board to "regulate the applicant's business (as opposed to the land and buildings in which that business is conducted) is illegal, invalid and void of action." (RR Trial Brief, p. 12.) Additionally it claims that the "Town of Ridgefield Zoning Precedent and . . . case law make clear that the zoning authorities themselves understand that there is no distinction among `types' of products and that change in the kind of product sold does not amount to a change of use." (RR Trial Brief, p. 20.) RR also reiterates the arguments it set forth in the original brief.
On August 5, 1994, the Board filed its brief in response to RR's arguments, arguing that it was well within its discretion in upholding the planning director's action. On December 30, 1994, the Board filed a post trial brief, arguing that the conditions imposed on the Amatulli variance were reasonable and enforceable.
On December 30, 1994, the planning director filed his brief arguing that the plaintiffs failed to maintain aggrievement throughout the course of the appeal and, as a result, the matter should be dismissed. Further, he argues that RR was not an applicant before the planning director; therefore, the Board had no subject matter jurisdiction to hear its appeal.
On December 12, 1994, the matter was tried before this court. CT Page 5136
The plaintiffs allege aggrievement. (Plaintiffs' Amended Complaint, par. 21.) Aggrievement is a jurisdictional question.Winchester Woods Associates v. Planning Zoning Commission,219 Conn. 303, 307, 592 A.2d 953 (1991). Unless the plaintiff alleges and proves aggrievement, the case must be dismissed. McNally v.Zoning Commission, 225 Conn. 1, 5-6, 621 A.2d 279 (1993). Every presumption, however, should be indulged in favor of aggrievement. Killingly v. Connecticut Sitting Council, 220 Conn. 516,522, 600 A.2d 752 (1991).
Aggrievement is a question of fact for the trial court.Fuller v. Planning Zoning Commission, 21 Conn. App. 340, 343,573 A.2d 1222 (1990). The trial court's ruling on the issue of aggrievement will not be disturbed unless "it is clearly erroneous in view of the evidence and pleadings." (Internal quotation marks omitted.) DiBonaventura v. Zoning Board ofAppeals, 24 Conn. App. 369, 374, 588 A.2d 244, cert. denied,219 Conn. 903, 593 A.2d 129 (1991). "Conclusions are not erroneous unless they violate law, logic or reason or are inconsistent with the subordinate facts." (Internal quotation marks omitted.) Id.
"Aggrievement falls within two broad categories, classical and statutory." Cole v. Planning Zoning Commission, 30 Conn. App. 511,514, 620 A.2d 1324 (1993). To establish classical aggrievement the plaintiff must sustain his ownership interest in the property from the time of the agency's decision until the litigation in the matter is terminated. See Pollio v.Conservation Commission, 32 Conn. App. 109, 114, 628 A.2d 20
(1993)[4] (if the plaintiff fails to maintain an interest in the property throughout the course of the appeal, the appeal is moot); see also Goldfeld v. Planning Zoning Commission, 3 Conn. App. 172,177, 486 A.2d 646 (1985) (must maintain interest throughout course of appeal). "It is not enough for a party to have an [ownership] interest in the property sufficient to establish aggrievement only at the time of application to the commission." Primerica v. Planning Zoning Commission, 211 Conn. 85,94, 558 A.2d 646 (1989).
"The fundamental test for determining [classical] aggrievement encompasses a well-settled twofold determination: first, the party claiming aggrievement must successfully demonstrate a specific, personal, and legal interest in the subject matter of the decision, as distinguished from a general interest, such as is the concern of all members of the community CT Page 5137 as a whole. Second, the party claiming aggrievement must successfully establish that this specific personal and legal interest has been specially and injuriously affected by the decision." (Citations omitted; internal quotation marks omitted.)Munhall v. Inland Wetlands Commission, 221 Conn. 46, 51,602 A.2d 566 (1992).
"The owner of the property which forms the subject matter of the application to the agency is always aggrieved." R. Fuller, Land Use Law and Practice, Sec. 32.5, p. 538 (1993), citingWinchester Woods Associates v. Planning Zoning Commission,
supra, 219 Conn. 308. Non-owners, on the other hand, must establish a continuous "substantial and legitimate interest" in the property in order to maintain aggrievement. Primerica v.Planning Zoning Commission, supra, 211 Conn. 93. "[T]he extent to which a party with an interest in the property other than that of an owner is aggrieved depends upon the circumstances of each case, because the concept of standing is a practical and functional one designed to ensure that only those parties with asubstantial and legitimate interest can appeal an order."
(Emphasis supplied.) Id.
This court must determine whether the partnership's maintenance of a $1,500 purchase money mortgage on the property is sufficient to establish aggrievement.
In Richards v. Planning Zoning Commission, 170 Conn. 318,323-24, 365 A.2d 1130 (1976), the Supreme Court held that the determination of non-owner aggrievement depends on "[w]hether the applicant is in control of the property, whether he is in possession or has a present or future right to possession, whether the use applied for is consistent with the applicant's interest in the property, and the extent of the interest of other persons in the same property. . . ."
Considering the foregoing factors, the court finds that the partnership has not established a continuous, substantial and legitimate interest in the property. Their ownership status that expired on September 2, 1994 was sufficient to establish aggrievement up until that time. However, their subsequent sale of the property for $315,000, and the retention of a mere $1500 purchase money mortgage, does not rise to the level of a "substantial and legitimate" interest sufficient to maintain aggrievement. Id. They have no right to control the property and no right to future possession of the property. Further, the CT Page 5138 extent of RR's interest in the property is greatly superior to that of the partnership.
In Primerica, the court found aggrievement where the applicant maintained a lease on the property, held a right of first refusal and a $15.1 million dollar mortgage. Id., 93-94. In the present case, that the only interest that the partnership maintains in the property is a nominal mortgage, retained, it appears, in an attempt to sustain an interest in this appeal. Unlike the Primerica case, however, the interest maintained by the partnership is not "substantial and legitimate." Id., 93.
In Burke v. Zoning Board of Appeals, 8 CSCR 482, 484 (April 19, 1993, Fuller, J.), the court held that a fourth mortgagee maintained an insufficient interest in the property to establish classical aggrievement. Judge Fuller wrote that "[t]he fourth mortgage is merely security for the debt. There is no evidence that the granting of setback variances for the subject property impaired the plaintiff's interest in the fourth mortgage on adjacent property. The mortgage exists only as security for the debt owed by [the plaintiff,] and the board's decision does not affect that debt. If the plaintiff has inadequate security for its loan, which appears to be the case, it is immaterial whether or not the board granted a variance for adjacent property. Finally, the fact that the plaintiff might redeem the fourth mortgage on the law day at some time in the future is immaterial. He was not aggrieved when the appeal was taken, and the fact that he might be aggrieved in the future is insufficient. Foran v.Zoning Board of Appeals, [158 Conn. 331, 336, 260 A.2d 609
(1969)]." Id.
Although the Burke case dealt with a variance, the court finds that the legal principles enunciated by Judge Fuller are applicable to this case. The denial of the site plan does not impair the partnership's $1,500 mortgage interest. Further, there is no evidence that the mortgage is at all affected by the site plan denial. Moreover, "the fact that the [partnership] might redeem the property on the law day at some time in the future is immaterial." Id. The court finds that a $1500 mortgage is insufficient, under the facts of this case, to allow the partnership to maintain aggrievement.
Therefore, based on the insubstantial interest that the partnership maintains in this appeal, the court finds that the partnership is not aggrieved since it has not carried its burden CT Page 5139 of proving a continuous, substantial, "personal and legal interest [that] has been specially and injuriously affected by the decision." Munhall v. Inland Wetlands Commission, supra,221 Conn. 51; Primerica v. Planning Zoning Commission, supra,211 Conn. 93.
The court now addresses whether RR has proven that it has standing to maintain the appeal. "Standing implicates the court's subject matter jurisdiction." D.S. Associates v. Planning Zoning Commission, 27 Conn. App. 508, 511, 607 A.2d 455 (1992). "The concept of standing involves aggrievement, that is an injury in fact, plus whatever other conditions must exist to allow a party to appeal." R. Fuller, supra, Sec. 32.7, p. 548. "When standing is put in issue, the question is whether the person whose standing is challenged is a proper party to request an adjudication of the issue and not whether the controversy is otherwise justiciable, or whether, on the merits, the plaintiff has a legally protected interest that the defendant's action has invaded." D.S. Associates v. Planning Zoning Commission, supra,27 Conn. App. 511. Where a party has failed to prove standing, it is immaterial whether the party is aggrieved. See id. (court found party to be aggrieved but, nonetheless, affirmed the trial court's dismissal of the appeal where the party lacked standing to appeal since it did not file an application for subdivision approval with the commission).
A condition on RR's maintenance of an appeal in this case is that it first must have been an applicant before the planning director. General Statutes, Sec. 8-7; Ridgefield Code, Sec. 324.0GRecourse. At the time of the filing of their application for site plan approval, RR was not listed as an applicant on the form; the only applicant for site plan approval was "Attorney Melvin J. Silverman." (ROR, Exhibit Z, p. 582.) Attorney Silverman represented the partnership, not RR. (ROR, Exhibit Z, p. 584.) Moreover, RR had not ascended to the status of a lessee at that point, they were only prospective lessees. (Plaintiff's Exhibit 5.) Attorney Silverman's July 2, 1993 letter accompanying the application for site plan approval corroborates the fact that the status of RR was only that of a prospective lessee and not that of an applicant. In the letter, Attorney Silverman wrote, "I represent the owners, [the partnership,] of the premises in question who wish to lease the premises to a seller of fine furniture, [RR,] albeit of the type which is used generally out of doors." (ROR, Exhibit Z, p. 580.) These facts establish that RR had no standing to appeal the planning director's decision to CT Page 5140 the Board since it was not an applicant before the planning director in the first instance.
Pursuant to General Statutes, Sec. 8-7, the Zoning Board of Appeals is empowered to hear appeals from the denial of a site plan application. "The concurring vote of four members of the zoning board of appeals shall be necessary to reverse any order, requirement or decision of the official charged with the enforcement of the zoning regulations or to decide in favor ofthe applicant any matter upon which it is required to pass under any . . . ordinance, rule or regulation. . . ." (Emphasis supplied.) Id. Further, Ridgefield Code, Sec. 324.0G Recourse,
indicates that "[d]ecisions made by the planning director or the zoning enforcement officer in pursuance of section 324.0F [dealing with site plan approval], may be appealed by theapplicant to the zoning board of appeals." (Emphasis supplied.)
In the present case, the only applicant before the planning director was the partnership. Therefore, the partnership alone, and not RR, was entitled to have its appeal heard by the Board.
In D.S. Associates v. Planning Zoning Commission, supra,27 Conn. App. 510-12, a factual scenario almost identical to that in the instant case was present and the court held that the plaintiff lacked standing to maintain the appeal. "Twin Pines was never involved in the proceedings before the commission. Further, the commission never considered Twin Pines an applicant for subdivision approval or a party to the application proceedings. Neither Twin Pines nor its agent signed the application. Twin Pines did not seek to substitute itself for D.S. Associates before the commission, nor did it even identify itself to the commission." Id., 510. Further, the court found that the relevant statutes and regulations required Twin Pines to be a party to the applications. Id., 511.
In the present case RR was not involved in the proceedings before the planning director. There is no evidence in the record that the planning director considered RR to be an applicant for site plan approval. In fact, the planning director argues in his brief that RR was not an applicant before him. Further, neither RR nor its agent signed the application for site plan approval. RR was only identified to the planning director as a prospective lessee, not an applicant. Further, as in D.S. Associates, the statute, General Statutes, Sec. 8-7, and the regulation, Ridgefield Code, Sec. 324.0G Recourse, provides that the CT Page 5141 applicant is the party empowered to take an appeal from the planning director's denial of site plan approval.
Because RR had no standing to appeal the planning director's denial of the partnership's application for site plan approval, the court lacks subject matter jurisdiction over his appeal. D.S.Associates v. Planning Zoning Commission, supra, 27 Conn. App. 511-12; see also Orange Mall Shopping Center v. Planning ZoningCommission, 5 CSCR 288, 290 (February 22, 1990, Fuller, J.) (finding no aggrievement where intervenor did not own property at time the appeal was taken and was not an applicant before the board that rendered the decision).
The court finds that the partnership is not aggrieved by virtue of its $1,500 purchase money mortgage and that RR does not have standing to prosecute this appeal. Accordingly, the court dismisses the appeal.
Riefberg, J.